# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SHIRISH KUMAR,<br><br>Petitioner,<br><br>v.<br><br>FAITH TUSIESEINA, FRANKLIN TUSIESEINA, ANITRA TUSIESEINA, and JORDAN TUSIESEINA,<br><br>Respondents. | **MEMORANDUM DECISION AND ORDER GRANTING VERIFIED COMPLAINT AND PETITION FOR RETURN OF CHILD PURSUANT TO THE HAGUE CONVENTION**<br><br>Case No. 2:25-cv-832<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Petitioner Shirish Kumar sues Respondents Faith Tusieseina, Franklin Tusieseina, Anitra Tusieseina, and Jordan Tusieseina, seeking the return of his and Faith Tusieseina's child to Sweden under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act. The court held a two-day evidentiary hearing on January 20 and 21, 2026, during which the parties presented testimony and exhibits. The court grants Mr. Kumar's petition and orders that the child be returned to Sweden.

## FINDINGS OF FACT

### A.

1. Petitioner Shirish Kumar and Respondent Faith Tusieseina are the parents of a three-and-a-half-year-old child, M.K. *See* Dkt. No. 1 ¶¶ 12, 16; Dkt. No. 26 ¶¶ 1, 3.

2. Mr. Kumar currently lives in Stockholm, Sweden, and is a Swedish citizen. *See* Dkt. No. 1 ¶¶ 1, 12; Dkt. No. 26 ¶ 1.

3.    Ms. Tusieseina currently lives in Utah and is a United States citizen. *See* Evid. Hr'g Tr. 249:23–24, 286:14–16.[1]

4.    M.K. is a dual citizen of the United States and Sweden. *See* Dkt. No. 1 ¶ 12; Dkt. No. 26 ¶ 1.

5.    Respondents Franklin and Anitra Tusieseina are Ms. Tusieseina's parents. *See* Dkt. No. 1 ¶ 1; Dkt. No. 26 ¶ 1.

6.    Respondent Jordan Tusieseina is Ms. Tusieseina's brother. *See* Dkt. No. 1 ¶ 1; Dkt. No. 26 ¶ 1.

7.    Mr. Kumar and Ms. Tusieseina met in Dubai in February 2021 through a dating app. *See* Evid. Hr'g Tr. 152:5–11, 249:25–250:1.

8.    At that time, Mr. Kumar worked and lived in Dubai. *See id.* 150:15–17. Ms. Tusieseina worked and lived in Los Angeles, California, but was vacationing in Dubai. *See id.* 249:25–250:6.

9.    Mr. Kumar and Ms. Tusieseina began to date and, in January 2022, Ms. Tusieseina discovered she was pregnant. *See id.* 253:4–6.

10.    In anticipation of the child's birth, Ms. Tusieseina and her mother traveled to Sweden to meet Mr. Kumar's parents. *See id.* 260:2–5, 14–19.

11.    While there, Mr. Kumar and Ms. Tusieseina participated in a Hindu-Sikh religious ceremony that served as a blessing for their expected child and marked their engagement to raise the child together. *See id.* 46:13–25, 260:14–19.

---

[1] Pages 1 through 240 of the evidentiary hearing transcript can be found at Docket Number 42. Pages 241 through 479 of the transcript can be found at Docket Number 43.

12.     Sometime between April and June 2022, Mr. Kumar moved from Dubai to Sweden. *See id.* 44:3–8.

13.     In August 2022, Ms. Tusieseina moved from Los Angeles to live with her parents in Utah. *See id.* 384:6–16.

14.     On September 10, 2022, two days before M.K. was born, the couple applied for Ms. Tusieseina to receive a Swedish residence permit. *See* Pet'r's Ex. 28A at 9; Evid. Hr'g Tr. 50:4–11.

15.     On September 12, 2022, M.K. was born in Utah. *See* Dkt. No. 1 ¶ 16; Dkt. No. 26 ¶ 3; Evid. Hr'g Tr. 384:17–18.

16.     Mr. Kumar arrived in Utah approximately one day later and stayed with Ms. Tusieseina and M.K. for about a month before returning to Sweden. *See* Evid. Hr'g Tr. 85:15–18.

17.     Ms. Tusieseina and M.K. remained in Utah at a house in Cedar Hills owned by Ms. Tusieseina's grandmother. *See id.* 86:3–9, 88:7–9.

18.     On February 5, 2023, Ms. Tusieseina and M.K. traveled to Sweden. *See id.* 51:21–22, 340:22–24.

19.     The same day, M.K.'s Swedish residence permit was approved.[2] *See* Pet'r's Ex. 4 at 1; Dkt. No. 1 ¶ 17; Dkt. No. 26 ¶ 3.

---

[2] In the supplement to her own application for a residence permit, Ms. Tusieseina represented to the Swedish Tax Authority that "[w]e were in Sweden from February to April 2023 when we applied for [M.K.]'s registration." Pet'r's Ex. 28A at 8. But Mr. Kumar testified, and documentary evidence suggests, that the family met with the Swedish consulate in Salt Lake City in October 2022 regarding M.K.'s application for a residence permit. *See* Evid. Hr'g Tr. 52:8–12; Pet'r's Ex. 26A at 2–3; Pet'r's Ex. 27 at 2–3. Considering together all the parties' evidence on this issue, the court finds it likely that the couple at least began the process of applying for M.K.'s Swedish residence permit shortly after M.K.'s birth.

20.     Sometime in 2023, Ms. Tusieseina applied for and began receiving Swedish social benefits for M.K. *See* Pet'r's Ex. 14A at 3.

21.     While in Sweden, the couple and M.K. stayed at Mr. Kumar's parents' house. *See* Evid. Hr'g Tr. 287:3–10.

22.     The next month, the couple and M.K. traveled to London and Paris. *See id.* 88:22–25, 344:15–17.

23.     At the end of their Paris trip, on March 23, 2023, Mr. Kumar returned to Sweden and Ms. Tusieseina and M.K. returned to the United States. *See id.* 88:25–89:1, 345:8–9.

24.     For most of the next few months, Ms. Tusieseina and M.K. stayed with Ms. Tusieseina's parents in Highland, Utah. *See id.* 89:13–18.

25.     In May 2023, the Swedish Tax Authority requested additional information from Ms. Tusieseina regarding her application for a Swedish residence permit. *See* Pet'r's Ex. 28A at 2; Evid. Hr'g Tr. 60:5–8, 310:2–15.

26.     With the help of Mr. Kumar, Ms. Tusieseina submitted the following response to a questionnaire provided by the tax authority: "Our plan is to live in Sweden together with the child's father, Shirish Kumar. . . . We were in Sweden from February to April 2023 when we applied for [M.K.'s] registration, and we are currently in the US as I am only allowed to visit Sweden for 3 months at a time." Pet'r's Ex. 28A at 8; *see also* Evid. Hr'g Tr. 310:2–15.

27.     Ms. Tusieseina further stated in her response that she planned to move to Sweden on "2023-07-26" and that "[o]ur plan is for [M.K.] to live in Sweden [and] to establish herself in Swedish society and attend preschool." Pet'r's Ex. 28A at 9.

28.     In June 2023, Ms. Tusieseina traveled to the Swedish Embassy in Washington, D.C. for an interview regarding her application for a Swedish residence permit. *See* Pet'r's Ex. 32 at 2–4.

29.     Ms. Tusieseina's Swedish residence permit was approved soon afterwards. *See* Pet'r's Ex. 43; Pet'r's Ex. 5 at 1.

30.     On July 27, 2023, Ms. Tusieseina and M.K. traveled to Sweden and stayed with Mr. Kumar at his apartment in Stockholm. *See* Evid. Hr'g Tr. 345:10–11.

31.     Around this time, the couple transported M.K.'s crib and stroller, as well as two suitcases containing clothing and personal items belonging to Ms. Tusieseina and M.K., from the United States to Sweden. *See id.* 103:18–104:11, 275:21–276:12.

32.     On October 27, 2023, Ms. Tusieseina and M.K. returned to the United States. *See id.* 345:12–13.

33.     They stayed in the United States until January 10, 2024, when they returned to Sweden. *See id.* 345:14–15. While Ms. Tusieseina and M.K. were in the United States, it appears that they again stayed primarily, though not exclusively, at Ms. Tusieseina's parents' house in Highland, Utah. *See id.* 93:3–12, 179:17–180:6; Resp't's Ex. 3.

34.     Later that month, M.K. started attending preschool in Sweden for a few hours each day. *See* Evid. Hr'g Tr. 107:12–16, 267:4–7; Pet'r's Ex. 37A at 3.

35.     In June 2024, the couple executed a prenuptial agreement addressing matters including marital property and spousal support and stipulating that "this Agreement shall be governed by the laws of Swedish jurisdiction." Pet'r's Ex. 24 at 4.

36.     Later that month, on June 29, 2024, Ms. Tusieseina and Mr. Kumar were married in Stockholm. *See* Pet'r's Ex. 4 at 2; Evid. Hr'g Tr. 338:5.

37.     The following day, Ms. Tusieseina and M.K. returned to the United States and remained there until September 2, 2024, when they returned to Sweden. *See* Evid. Hr'g Tr. 345:16–21. Mr. Kumar testified that he accompanied Ms. Tusieseina and M.K. during this stay in the United States, and that the three spent time in Highland and St. George, Utah, as well as Los Angeles, California. *See id.* 180:22–181:4.

38.     Upon returning to Sweden, M.K. resumed attending preschool, now on a full-day schedule from 9:00 a.m. to 3:00 p.m., Monday through Friday. *See* Pet'r's Ex. 35A at 2.

39.     Around November 2024, Ms. Tusieseina applied for work in Sweden. *See* Pet'r's Ex. 17.

40.     For the 2024 tax year, Ms. Tusieseina filed a California Resident Income Tax Return. *See* Resp't's Ex. 13. On that return, she listed her "principal/physical residence address" as the apartment in Stockholm where she lived with Mr. Kumar and M.K. *See id.* at 1. She testified that she did not claim M.K. as a dependent on her California return because she was receiving Swedish benefits for M.K at that time. *See* Evid. Hr'g Tr. 306:11–15.

41.     At some point between July 2023 and January 2025, the couple purchased items in Sweden for M.K.'s use, including toys, toy storage furniture, a small desk, a high chair, books and a bookshelf, and clothing. *See id.* 103:18–104:11, 314:20–25; Pet'r's Ex. 44.

42.     The couple agreed that Ms. Tusieseina and M.K. would travel to the United States for a three-week stay from January 15 to February 5, 2025, and Ms. Tusieseina purchased round-trip tickets for flights on those dates. *See* Evid. Hr'g Tr. 110:17–21; Dkt. No. 1 ¶ 32; Dkt. No. 26 ¶ 1.

43. In early January 2025, the couple had a significant fight, which resulted in Ms. Tusieseina's and M.K.'s leaving Mr. Kumar's apartment and staying with Mr. Kumar's parents for the next two days. *See* Evid. Hr'g Tr. 111:1–3, 183:20–22, 318:20–319:2.

44. On January 5, 2025, Ms. Tusieseina traveled with M.K. to the United States. *See id.* 345:22–23. She and M.K. have not returned to Sweden since that date. *See id.* 231:19–21.

45. In April 2025, Ms. Tusieseina filed for divorce in Sweden. *See id.* 363:13–17.

**B.**

1. Ms. Tusieseina considers July 27, 2023 to be the day she and M.K. "actually moved" to Sweden. Evid. Hr'g Tr. 287:13–14; *see also id.* 269:19–22, 281:18–20, 370:22–25.

2. Ms. Tusieseina maintains, however, that the move was not intended to be permanent and that the couple considered Sweden to be a temporary living arrangement, anticipating that they might reside there for approximately one or two years while seeking employment and housing in Dubai. *See id.* 269:19–22, 270:12–15, 370:17–19.

3. Ms. Tusieseina admits that Sweden was the only place where she, Mr. Kumar, and M.K. could all legally live together for longer than ninety days at a time. *See id.* 370:10–15.

4. Between June and December 2023, Ms. Tusieseina discussed a job opportunity in Los Angeles with a former colleague, applied for the position, completed the interviewing process, and received an offer. *See id.* 289:8–290:8; Resp't's Ex. 3. Ms. Tusieseina testified that she declined the job offer because Mr. Kumar asked her to do so and because she needed to return to Sweden to assist him during a manic episode that required heavy medication and her care. *See* Evid. Hr'g Tr. 290:20–292:21. Mr. Kumar denies that he had a manic episode. *See id.* 170:8–21.

7

5.      From November 2022 through November 2024, the couple periodically exchanged text messages discussing the possibility of obtaining employment in Dubai and moving there. *See* Resp't's Ex. 2.[3] During that period, they also searched for job postings in Dubai. *See* Resp't's Ex. 6.[4]

6.      In August 2024, the couple also discussed the possibility of Mr. Kumar's applying for permanent resident status in the United States. *See* Evid. Hr'g Tr. 190:19–191:1. Around that time, Ms. Tusieseina's father, Franklin Tusieseina, emailed an immigration attorney, introducing his daughter "who lives in Sweden with her [h]usband and daughter" and inquiring about the process for obtaining a green card. *See* Resp't's Ex. 5 at 3. Mr. Kumar did not himself communicate with the attorney and he did not apply for a green card. *See* Evid. Hr'g Tr. 191:21–25.

7.      Franklin Tusieseina considered Ms. Tusieseina and M.K. to be living in Sweden at the time he sent that email and to have continued residing there until January 2025. *See id.* 236:8–16.

### C.

1.      From M.K.'s birth until January 2025, Ms. Tusieseina took on the primary responsibility of caring for M.K. *See* Evid. Hr'g Tr. 321:4–19. During periods when Ms. Tusieseina and M.K. were in the United States without Mr. Kumar, Ms. Tusieseina was solely responsible for M.K.'s care. *See id.* Further, Ms. Tusieseina testified that even when Mr. Kumar was with them in the United States, she would often take M.K. out early in the morning and

---

[3] Ms. Tusieseina's exhibit list identifies this exhibit as Exhibit 6, but her attorney presented it as Exhibit 2 at the evidentiary hearing.

[4] Ms. Tusieseina's exhibit list identifies this exhibit as Exhibit 2, but her attorney presented it as Exhibit 6 at the hearing.

again around midday for various activities—such as going to the library or the splash pad—but Mr. Kumar would not join them because he slept in late in the mornings and napped in the afternoons. *See id.* 330:11–18. Anitra Tusieseina likewise testified that Mr. Kumar slept frequently during the day when he stayed at her house in Utah. *See id.* 391:12–24. When Mr. Kumar was present with Ms. Tusieseina and M.K., he sometimes assisted with caregiving responsibilities, including cooking, bathing M.K., playing with her, and taking her to the park. *See id.* 38:19–24, 81:1–14, 225:13–18, 391:16–17, 394:21–22. But even during those periods, Ms. Tusieseina remained primarily responsible for M.K.'s day-to-day care. *See id.* 225:17–18, 321:4–15, 386:2–16. Although the parties disputed the extent of Mr. Kumar's involvement in caring for M.K., the court has little difficulty finding that Ms. Tusieseina was far-and-away M.K.'s primary caregiver.

2.      Mr. Kumar testified that while the family stayed in Sweden, he provided financial support for them. *See id.* 84:22–85:5. By contrast, Ms. Tusieseina testified that although Mr. Kumar gave her his debit card, she rarely used it because he closely scrutinized and criticized any purchases she made with the card, and she accordingly used her own money to support M.K. *See id.* 274:7–17. Ms. Tusieseina also testified that she paid all prenatal medical expenses and the hospital delivery costs associated with M.K.'s birth, that she showed Mr. Kumar the bills, and that he did not offer to pay any portion of them. *See id.* 256:18–257:13. Mr. Kumar initially testified that he did not understand the meaning of "pre-birth expenses" or "[m]edical bills associated with having a baby," but then testified that he offered to pay expenses related to the delivery and that Ms. Tusieseina refused to accept payment. *Id.* 168:17–169:9, 169:12–25. Ms. Tusieseina further testified that, even after the birth, Mr. Kumar did not offer any financial support for M.K. until after she traveled to Sweden for the first time in February 2023. *See id.*

257:16–17. During subsequent periods when Ms. Tusieseina and M.K. were in the United States, Ms. Tusieseina was again the sole financial provider for M.K. *See id.* 284:15–20. The court finds Ms. Tusieseina's testimony regarding these matters more credible than Mr. Kumar's.

**D.**

1.     When Ms. Tusieseina and M.K. stayed at Ms. Tusieseina's parents' house in Utah before January 2025, Ms. Tusieseina regularly took M.K. to the library for story time, to a splash pad, to play with her cousins, and to a local farm to feed animals. *See* Evid. Hr'g Tr. 330:11–24. M.K. also attended church with Ms. Tusieseina's parents each Sunday. *See id.* 226:4–12, 330:22–24.

2.     M.K. was not enrolled in preschool in the United States at any time before January 2025. *See id.* 356:16–21.

3.     From July 2023 to January 2025, when M.K. was in Sweden, she would attend preschool and regularly go on walks to the park, go to the library, and go swimming. *See id.* 22:24–23:5. In addition, M.K. had a close relationship with Mr. Kumar's parents and would stay with them nearly every weekend. *See* Dkt. No. 1 ¶ 22; Dkt. No. 26 ¶ 3; Evid. Hr'g Tr. 81:18–25, 401:17–25. M.K. also attended routine doctor's checkups in Sweden. *See* Pet'r's Ex. 36A.

4.     Before January 2025, M.K.'s primary language was English, but she could speak some words and phrases in Swedish and Hindi (which was often used by Mr. Kumar's parents). *See* Evid. Hr'g Tr. 24:10–25:9, 320:15–24.

5.     According to her preschool teachers, M.K. "established social connections with children and adults and was happy when she met her friends at preschool. . . . The preschool's language is Swedish, and [M.K.] picked up words and phrases that she used spontaneously with

10

children and adults . . . and quickly learned the tunes of well-known Swedish children's songs." Pet'r's Ex. 35A at 2.

**E.**

1.      Mr. Kumar's and Ms. Tusieseina's relationship was frequently troubled and acrimonious throughout their time together. *See* Evid. Hr'g Tr. 176:8–16, 308:4–6, 316:5–6, 317:7–8, 317:21–23.

2.      Ms. Tusieseina testified that when she informed Mr. Kumar that she was pregnant with M.K., he was displeased and asked her to terminate the pregnancy but that she refused to do so. *See id.* 253:9–21. At the evidentiary hearing, Mr. Kumar initially refused to say whether he had made that request, explaining that he could not answer counsel's question "[b]ecause we're talking about my daughter. I cannot say that I ever wanted to abort her, no. No." *Id.* 154:2–22. When again pressed by counsel whether he had asked Ms. Tusieseina to terminate the pregnancy, he answered, "Maybe on initial reaction that lasted two or three days." *Id.* 154:24–25. The court finds Ms. Tusieseina's testimony about this issue credible.

3.      During their relationship, the couple argued and fought repeatedly. *See id.* 176:8–16, 308:4–6, 316:5–6, 317:7–8, 317:21–23. Ms. Tusieseina testified that leading up to January 5, 2025, the day she left Mr. Kumar and the Stockholm apartment, she and Mr. Kumar had recently fought and were "already in a really bad place" and "on edge." *Id.* 317:21–23. She further testified that around 5:00 a.m. on January 5, she was awake with M.K. who was crying. *See id.* 317:17–19. According to Ms. Tusieseina, when she could not console M.K., she returned to bed and told Mr. Kumar, "You can try now." *Id.* 317:24–318:2. She testified that this angered him and that he told her to "get the f— up or I'll kick you in the f—ing face." *Id.* 318:3–6. She further testified that, after they yelled at each other for some time, he told her to "[g]et the f—

out of my apartment." *Id.* 318:6–20. Mr. Kumar denied this account, testifying that "I don't remember exactly what I said, but I can assure you Faith has never been hurt." *Id.* 176:18–177:3. The court finds Ms. Tusieseina's testimony about this incident credible. Although the court also credits Mr. Kumar's testimony that he has never physically hurt Ms. Tusieseina, it otherwise finds his testimony regarding this incident to be evasive.

**F.**

1.    Since January 5, 2025, Ms. Tusieseina and M.K. have lived with Ms. Tusieseina's parents, Franklin and Anitra Tusieseina. *See* Evid. Hr'g Tr. 231:10–21.

2.    Ms. Tusieseina did not work from January through July 2025, and her parents provided for her needs during that time. *See id.* 232:3–9.

3.    Following Mr. Kumar's and Ms. Tusieseina's dispute in January 2025 and Ms. Tusieseina's subsequent departure to the United States, Franklin and Anitra Tusieseina did not know that Mr. Kumar had not consented to M.K.'s being in Utah. *See id.* 232:23–233:2. Rather, they understood that their daughter and Mr. Kumar had a dispute that they were working through between themselves. *See id.* 233:3–8.

4.    Franklin and Anitra Tusieseina only became aware that Mr. Kumar did not consent to M.K.'s remaining in the United States when they were served with the petition in this case on September 24, 2025. *See* Dkt. No. 12 at 2; Dkt. No. 13 at 2; Evid. Hr'g Tr. 233:9–24.

5.    Since receiving the petition, Franklin and Anitra Tusieseina have continued to provide housing to Ms. Tusieseina and M.K. *See* Evid. Hr'g Tr. 234:7–11.

6.    Since January 2025, Ms. Tusieseina has made several trips with M.K. to visit Ms. Tusieseina's brother, Jordan Tusieseina, in Los Angeles, California. *See id.* 448:5–14.

7.        Jordan Tusieseina testified that at some point before 2021, Ms. Tusieseina's and his grandmother expressed her intent to leave the Los Angeles house in which Jordan Tusieseina currently resides to both of them. *See id.* 435:12–19. Although legal title to the house in Los Angeles was transferred to Jordan Tusieseina alone when their grandmother passed in 2021 or sometime thereafter, the court credits Jordan Tusieseina's testimony that he and Ms. Tusieseina have a verbal understanding, consistent with their grandmother's intent, that Ms. Tusieseina holds an ownership interest in the property (presumably a beneficial or other equitable interest) and therefore has a right to reside there. *See id.* 435:6–13, 448:18–20. Ms. Tusieseina corroborated her brother's testimony, and Mr. Kumar did not rebut it.

## CONCLUSIONS OF LAW

The Hague Convention on the Civil Aspects of International Child Abduction, an international agreement to which the United States is a party, was adopted "to address the problem of international child abductions during domestic disputes." *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (cleaned up). This Convention "generally requires courts in the United States to order children returned to their countries of habitual residence, if the courts find that the children have been wrongfully removed to or retained in the United States." *Chafin v. Chafin*, 568 U.S. 165, 168 (2013).

"The International Child Abduction Remedies Act (ICARA), . . . 22 U.S.C. § 9001 *et seq.*, implements our Nation's obligations under the Convention." *Monasky*, 589 U.S. at 72. The Convention and the ICARA "empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4). Thus, even when the child's parents are embroiled in a custody dispute, "the Convention . . . requires the prompt return of a child wrongfully removed or retained away from

13

the country in which she habitually resides" so that, "[u]pon the child's return, the custody adjudication will proceed in that forum." *Monasky*, 589 U.S. at 72.

## I.

Mr. Kumar bears the burden of establishing that M.K. was "wrongfully removed" "by a preponderance of the evidence." 22 U.S.C. § 9003(e)(1)(A). To meet this burden, he must show that it is more likely than not true that "(1) [M.K.] was habitually resident in [Sweden] at the time of the removal or retention; (2) the removal or retention was in breach of [Mr. Kumar]'s custody rights under the laws of [Sweden]; and (3) [Mr. Kumar] was exercising those rights at the time of removal or retention." *Takeshi Ogawa v. Kyong Kang*, 946 F.3d 1176, 1178–79 (10th Cir. 2020) (cleaned up). The parties dispute only the first element—whether M.K. was habitually resident in Sweden at the time of her removal on January 5, 2025.

While "[t]he Hague Convention does not define the term 'habitual residence,'" the Supreme Court has held that it means "[t]he place where a child is at home, at the time of removal or retention." *Monasky*, 589 U.S. at 76–77. Because "a child's habitual residence depends on the totality of the circumstances specific to the case," determining where the child is at home requires "a fact-sensitive inquiry, not a categorical one." *Id*. at 71, 77. The "court must take account of *all* the circumstances of fact specific to [the] individual case." *Id.* at 80 n.4 (cleaned up). "A child 'resides' where she lives," but "[h]er residence in a particular country can be deemed 'habitual' . . . only when her residence there is more than transitory." *Id.* at 76. "What makes a child's residence 'habitual' is therefore some degree of integration by the child in a social and family environment." *Id.* at 77 (cleaned up).

The specific facts relevant to habitual residence vary depending on the child's age and circumstances. "For older children capable of acclimating to their surroundings, . . . facts

indicating acclimatization [are] highly relevant." *Id.* at 78. By contrast, where children are "too young or otherwise unable to acclimate, . . . the intentions and circumstances of caregiving parents are relevant considerations." *Id.*

## II.

Because M.K. was approximately two years and four months old at the time she left Sweden, she falls near the margin of being "too young . . . to acclimate" and being "capable of acclimating to [her] surroundings." *Id.* The court therefore considers both the intentions and circumstances of her parents and the facts indicating M.K.'s acclimation. The court concludes that both sets of considerations indicate that M.K.'s habitual residence was in Sweden at the time she left there in January 2025.

## A.

Ms. Tusieseina presented substantial evidence that she was M.K.'s primary caregiver from her birth until the time they both returned to the United States in January 2025. *See* FoFs C.1–2. While Ms. Tusieseina's intentions and circumstances may therefore merit extra weight, the evidence regarding these matters points to Sweden as M.K.'s habitual residence.

Even before M.K. was born, Ms. Tusieseina took concrete steps to establish a life with Mr. Kumar and M.K. in Sweden. Indeed, two days before M.K.'s birth in September 2022, Ms. Tusieseina applied for a Swedish residence permit. *See* FoF A.14. Shortly after M.K.'s birth, Ms. Tusieseina and Mr. Kumar began the process of applying for M.K.'s Swedish residence and citizenship. *See* FoF A.19 n.2. And once M.K.'s residence was approved, Ms. Tusieseina applied for and began receiving Swedish government benefits on M.K.'s behalf. *See* FoF A.20. These actions demonstrate an intent to secure legal status for both herself and M.K. in Sweden and to receive the benefits associated with living there.

15

Ms. Tusieseina's statements to the Swedish government further confirm this intent. In supplementing her application for residence, Ms. Tusieseina, with Mr. Kumar's assistance, represented that "[o]ur plan is to live in Sweden together with the child's father, Shirish Kumar. . . . We were in Sweden from February to April 2023 when we applied for [M.K.'s] registration, and we are currently in the US as I am only allowed to visit for 3 months at a time." FoF A.26. Ms. Tusieseina further represented that she planned to move to Sweden on "2023-07-26," and that "[o]ur plan is for [M.K.] to live in Sweden [and] to establish herself in Swedish society and attend preschool." FoF A.27. Consistent with these stated plans, Ms. Tusieseina traveled to the Swedish Embassy in Washington, D.C. in June 2023 to interview for her residence permit. *See* FoF A.28.

Ms. Tusieseina and M.K. in fact moved to Sweden in July 2023, shortly after Ms. Tusieseina received her Swedish residence permit. *See* FoFs A.29–31. Ms. Tusieseina acknowledges that, once she received this permit, Sweden was the only country where she, Mr. Kumar, and M.K. could all legally live together for more than ninety days at a time. *See* FoF B.3. Following the move, the family established routines of daily life there. In January 2024, they enrolled M.K. in preschool in Sweden, initially on a half-day schedule but eventually on a full-day schedule. *See* FoFs A.34, A.38.

Ms. Tusieseina also adjusted her personal and legal affairs to reflect her residence in Sweden. In June 2024, Ms. Tusieseina married Mr. Kumar in Sweden and signed a prenuptial agreement providing that disputes regarding marital property and spousal support would be resolved in Swedish courts under Swedish law. *See* FoFs A.35–36. She applied for work in Sweden not long after. *See* FoF A.39. Further, on her 2024 California income tax return, Ms. Tusieseina listed the Stockholm apartment where she lived with Mr. Kumar and M.K. as her

"principal/physical residence address" and did not claim M.K. as a dependent because she was receiving Swedish benefits for M.K. at the time. *See* FoF A.40.

Ms. Tusieseina's family likewise understood that she and M.K. were living in Sweden from July 2023 to January 2025. *See* FoFs B.6–7. And even up to the time she left Sweden with M.K. in January 2025, Ms. Tusieseina's conduct reflects that Sweden remained M.K.'s home. Ms. Tusieseina initially planned only a three-week trip to the United States, after which she intended to return with M.K. to Sweden in February 2025. *See* FoF A.42. Only after a dispute with Mr. Kumar shortly before her planned departure did Ms. Tusieseina decide to take M.K. to the United States and not return. *See* FoFs A.43–44, E.3. Finally, Ms. Tusieseina filed for divorce in Sweden three months after leaving the country. *See* FoF A.45.

Taken together, these facts demonstrate that Ms. Tusieseina intended to reside in Sweden and took concrete steps to establish a life for M.K. and herself there. Indeed, Ms. Tusieseina admitted several times during the evidentiary hearing that she and M.K. lived in Sweden from July 2023 until January 2025. *See* FoFs B.1, B.3.

Ms. Tusieseina nevertheless contends that their residence in Sweden was intended to be only temporary because she and Mr. Kumar hoped to move to Dubai if he secured employment there, or, alternatively, to the United States if he obtained a green card and the couple found work here. *See* FoFs B.2, B.4–6.

It is true that "residence in a particular country can be deemed 'habitual'" only when it is "more than transitory." *Monasky*, 589 U.S. at 76. And the court credits the testimony and evidence showing that Ms. Tusieseina and Mr. Kumar discussed moving to Dubai and hoped to move there at some indefinite point in the future and that they also considered the possibility of living in the United States. *See* FoFs B.2, B.4–6. But the court concludes that those inchoate

17

aspirations and musings do not render M.K.'s residence in Sweden "transitory" within the meaning of *Monasky*. Until the moment Ms. Tusieseina decided to take M.K. to the United States and not return, neither she nor Mr. Kumar had any concrete plan or timeline in place to relocate to Dubai or anywhere else. Instead, the family had lived in Sweden for a significant period, established legal residence there, and enrolled M.K. in preschool there.

For all these reasons, the court concludes that the intentions and circumstances of the parents indicate that Sweden was M.K.'s habitual residence at the time Ms. Tusieseina took her to the United States in January 2025.

**B.**

Facts relevant to a child's acclimation include "a change in geography combined with the passage of an appreciable period of time, age of the child, immigration status of child and parent, academic activities, social engagements, participation in sports programs and excursions, meaningful connections with the people and places in the child's new country, language proficiency, and location of personal belongings." *Monasky*, 589 U.S. at 78 n.3 (cleaned up). The court concludes that, on balance, the evidence regarding these factors also points to Sweden as M.K.'s habitual residence at the time Ms. Tusieseina took her to the United States in January 2025.

M.K. obtained Swedish residence and citizenship in early 2023 and moved to Sweden that summer with her mother, who had just obtained a Swedish residence permit, so that the two of them could live with her father, who was a Swedish citizen. *See* FoFs A.19, A.29–31. Sweden served as M.K.'s primary place of residence for the next year and a half. *See generally* FoFs A.30–44.

18

To be sure, M.K. was very young, and her age no doubt limited her ability to acclimate fully to any location. Nevertheless, while living in Sweden, M.K. developed meaningful academic and social connections. She attended preschool there throughout 2024, where she interacted regularly with teachers and classmates, participated in structured daily activities, and encountered the Swedish language and culture. *See* FoFs A.34, A.38, D.3–5. During this time, she learned to speak some words and phrases in Swedish and became familiar with the words and tunes of Swedish children's songs. *See* FoFs D.4–5. On the weekends, she usually stayed with Mr. Kumar's parents and established a regular weekend routine with them. *See* FoF D.3. She also attended medical checkups and received monthly Swedish social benefits. *See* FoF A.20, D.3. And she kept or acquired personal belongings there, including her crib, stroller, and toys. *See* FoFs A.31, A.41.

It is true that M.K. continued to maintain significant ties to the United States even after she moved to Sweden in July 2023. She spent extended periods here, including visits between October 2023 and January 2024 and between the end of June and the beginning of September 2024. *See* FoFs A.32–33, A.37. During those visits, she and Ms. Tusieseina stayed with Ms. Tusieseina's parents in Utah, and M.K. established a routine here, including attending church with Ms. Tusieseina's parents every Sunday, spending time with her cousins, and going to the library, splash pad, and farm. *See* FoF D.1. And although M.K. knew some Swedish words and phrases, her primary language was always English. *See* FoF D.4.

But M.K.'s significant ties to the United States are not inconsistent with her overall acclimation to Sweden at the time she left Sweden in January 2025. From July 2023 to January 2025, M.K. spent substantially more time in Sweden than in the United States. *See generally* FoFs A.30, A.32–33, A.37, A.44. And although she spent more time as an infant in the United

19

States than in Sweden from her birth in September 2022 until July 2023, her time in Sweden corresponded to the next stage of her life when she was older and more developmentally capable of forming stable routines and social connections. *See generally* FoFs A.15, A.18, A.23, A.30. During that time, she attended preschool and established a consistent, structured daily life in Sweden. *See* FoFs D.3, D.5. By contrast, her time in the United States consisted primarily of visits and did not involve preschool enrollment or the same degree of structured routine. *See* FoFs D.1–2.

For all these reasons, the court concludes that M.K. was reasonably acclimated to Sweden, considering her young age, at the time her mother took her to the United States in January 2025.

\*     \*     \*

In sum, considering the totality of the circumstances specific to this case, the court concludes that Mr. Kumar has shown by a preponderance of the evidence that M.K. was habitually resident in Sweden at the time Ms. Tusieseina took her to the United States in January 2025. Given that Ms. Tusieseina does not dispute that her removal of M.K. from Sweden was in breach of Mr. Kumar's custody rights under Swedish law and that he was exercising those rights at the time of removal, the court therefore concludes that M.K. was wrongfully removed within the meaning of the Hague Convention and the ICARA and that M.K. must accordingly be returned to Sweden.[5]

---

[5] "Even if a removal is deemed unlawful, children are not required to return to the country of habitual residence if 'one of the affirmative defenses or narrow exceptions set forth in the Convention' applies." *Livingstone v. Livingstone*, 2023 WL 8524922, at \*2 (10th Cir. Dec. 8, 2023) (quoting *West v. Dobrev*, 735 F.3d 921, 931 (10th Cir. 2013)). One of those exceptions applies if the petitioner "had consented to . . . the removal or retention" of the child. International Child Abduction Convention Between the United States of America and Other Governments Done at the Hague October 25, 1980, Art. 13(a), Jul. 1, 1988, T.I.A.S. No. 11670. The

20

### III.

Mr. Kumar also seeks an order requiring the Respondents to pay his necessary expenses, including transportation expenses related to M.K.'s return to Sweden, court costs, and reasonable attorneys' fees. *See* Dkt. No. 1 at 12.

Under 22 U.S.C. § 9007(b)(3),

> [a]ny court ordering the return of a child pursuant to an action brought under section 9003 . . . *shall* order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, . . . and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

(emphasis added). For the reasons already explained, the court orders the return of M.K. to Sweden. And Ms. Tusieseina offers no reason why it would be clearly inappropriate to require her to pay Mr. Kumar's necessary expenses. The court therefore concludes that she is liable for these expenses.

Mr. Kumar also argues that Respondents Franklin and Anitra Tusieseina—Ms. Tusieseina's parents—and Respondent Jordan Tusieseina—Ms. Tusieseina's brother—should be held partially liable for his necessary expenses because they have facilitated M.K.'s wrongful retention in the United States.

Courts have held that nonparent respondents who assist in wrongfully removing or retaining children can be financially liable under the ICARA. *See, e.g.*, *Neves v. Neves*, 637 F. Supp. 2d 322, 346 (W.D.N.C. 2009); *Litowchak v. Litowchak*, 2015 WL 7428573, at *2 (D. Vt.

---

Respondent has the burden of establishing this exception "by a preponderance of the evidence." 22 U.S.C. § 9003(e)(2)(B).

In her amended answer, Ms. Tusieseina asserted as an affirmative defense that Mr. Kumar consented to M.K.'s removal or retention. *See* Dkt. No. 26 at 10. Ms. Tusieseina did not, however, pursue this theory at the evidentiary hearing, and the court finds no factual basis to conclude that Mr. Kumar consented to M.K.'s removal or retention in all events.

Nov. 20, 2015); *Jacquety v. Baptista*, 2020 WL 5946562, at *5 (S.D.N.Y. Oct. 7, 2020). In *Neves*, for example, the district court held the respondent's parents partially liable for the petitioner's necessary expenses because they had arranged travel, provided housing, and concealed the child's whereabouts while knowing the petitioner was unaware of the removal, allocating 85 percent of the expenses to the respondent and 15 percent to the respondent's parents. *See* 637 F. Supp. 2d at 347.

As for Jordan Tusieseina, the court found credible his testimony that Ms. Tusieseina has a beneficial or other equitable ownership interest in the Los Angeles house where she and M.K. stayed, and that she therefore had a right to reside there, as already explained. *See* FoF F.7. Under these circumstances, the court concludes that Jordan Tusieseina cannot be said to have assisted in wrongfully retaining the child based solely on Ms. Tusieseina's decision to exercise her right to spend some periods of time with M.K. at the house in Los Angeles where Jordan Tusieseina also resided.

The court reaches a different conclusion regarding Respondents Franklin and Anitra Tusieseina, however. The court finds credible their testimony that, following M.K.'s arrival in the United States, they did not know Mr. Kumar had not consented to M.K.'s remaining there. *See* FoF F.3. Rather, they believed Ms. Tusieseina and Mr. Kumar had a dispute that the couple was addressing between themselves. *See id.* Further, Ms. Tusieseina and M.K. had previously stayed with Franklin and Anitra Tusieseina for extended periods with Mr. Kumar's consent. *See* FoFs A.17, A.24, A.33, A.37. Indeed, Ms. Tusieseina and M.K. had already planned a trip to the United States in January 2025 with Mr. Kumar's blessing. *See* FoF A.42.

That said, Franklin and Anitra Tusieseina became aware that Mr. Kumar did not consent to M.K. remaining in the United States when they were served with the petition in this case on

September 24, 2025. *See* FoF F.4. Even so, they continued to provide housing and support to Ms. Tusieseina and M.K. *See* FoF F.5. The court concludes that, from that time forward, they knowingly helped facilitate M.K.'s wrongful retention.

Franklin and Anitra Tusieseina have presented no reason why an order requiring them to assist in paying Mr. Kumar's necessary expenses would be clearly inappropriate. The court accordingly concludes that they are jointly and severally liable with their daughter for a portion of Mr. Kumar's necessary expenses.

In light of Ms. Tusieseina's primary responsibility for the wrongful removal and retention, and Franklin and Anitra Tusieseina's much more limited role in assisting the retention after becoming aware of Mr. Kumar's objection, the court allocates liability for Mr. Kumar's necessary expenses as follows: Ms. Tusieseina shall be solely liable for 90 percent of those expenses, and Ms. Tusieseina, Franklin Tusieseina, and Anitra Tusieseina shall be jointly and severally liable for the remaining 10 percent of these expenses.

### IV.

**IT IS THEREFORE ORDERED:**

1.      That Docket Number 1, Verified Complaint and Petition for Return of Child Pursuant to the Hague Convention, is **GRANTED**;

2.      That Faith Tusieseina shall ensure M.K.'s return to Sweden within 21 days of the entry of this memorandum decision and order;

3.      That Faith Tusieseina is liable for 90 percent of Mr. Kumar's necessary expenses under 22 U.S.C. § 9007(b)(3), including court costs, reasonable attorneys' fees, and travel costs associated with Mr. Kumar's attending the evidentiary hearing and M.K.'s return to Sweden;

4.      That Faith, Franklin, and Anitra Tusieseina are jointly and severally liable for the remaining 10 percent of Mr. Kumar's necessary expenses under 22 U.S.C. § 9007(b)(3);

5.      That Mr. Kumar may file a declaration supported by appropriate documentation establishing the amount of necessary expenses incurred in connection with this action within 28 days of M.K.'s return to Sweden; and

6.      That Faith, Franklin, and Anitra Tusieseina may file any objections to the reasonableness of the requested expenses within fourteen days of the filing of Mr. Kumar's declaration.

*      *      *

Ms. Tusieseina presented substantial evidence that she has been far-and-away M.K.'s primary caregiver and financial supporter since the child's birth. She also submitted credible evidence that she brought M.K. into this world over Mr. Kumar's objections; that she sacrificed her life in the United States and her career in an attempt to establish a home with M.K. and the child's father, while Mr. Kumar sacrificed very little; that she was deeply unhappy in Sweden; that she and Mr. Kumar had an acrimonious and troubled relationship; and that the immediate cause of her decision to take M.K. to the United States was Mr. Kumar's ordering Ms. Tusieseina out of their apartment and threatening her with physical violence.

Given all this, the court has grave reservations about ordering M.K.'s return to Sweden. Nevertheless, because the circumstances and considerations giving rise to the court's reservations do not alter its legal conclusion that Sweden was M.K.'s habitual residence at the time of her removal, the court's hands are tied by the Convention and the ICARA. These circumstances and considerations are, however, assuredly relevant to the dispute regarding

24

M.K.'s custody that the treaty and statute commit to the Swedish courts for determination. The

court hopes and expects that the Swedish courts will give them due consideration.

Dated this 14th day of March, 2026.

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge

25